IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JOSEPH MICHAEL TORDA,                  )
by and through his guardians,          )
Susan Capuano Torda and Thomas Torda; and )
SUSAN CAPUANO TORDA,                   )
                                       )
                Plaintiffs,            )
                                       )        Case No. 1:11cv193 (GBL/TRJ)
        v.                             )
                                       )
FAIRFAX COUNTY SCHOOL BOARD,           )
                                       )
                Defendant.             )

**MEMORANDUM OPINION**

THIS MATTER is before the Court on the Motion for Judgment on the Record by

Defendant Fairfax County School Board (Dkt. No. 108), and the Motion for Judgment on the

Record by Plaintiffs Joseph Torda and Susan Capuano Torda (Dkt. No. 109). In this case, the

plaintiffs, a disabled student of Fairfax County Public Schools ("FCPS") and his mother,

challenge the decision of an administrative hearing officer that the FCPS had not overlooked any

areas of the student's disabilities and had provided an appropriate educational program.

There are two issues before the Court. The first issue is whether the Fairfax County

School Board ("FCSB") and FCPS violated the Individuals with Disabilities Education Act

("IDEA") in failing to evaluate Joseph Torda for Auditory Processing Disorder ("APD") and,

1

thereby, overlooking an area of Joseph's disability. The second issue is whether FCSB and FCPS violated the IDEA in failing to provide an educational program that addressed Joseph's auditory processing deficits during the 2007-08 school year. First, the Court holds that any claim against FCSB for failing to evaluate Joseph for APD prior to the 2007-08 school year is time-barred. Second, the Court holds that FCSB is not liable for failing to evaluate Joseph during the 2007-08 school year because Ms. Torda denied consent for the reevaluation of Joseph during that year. Third, the preponderance of the evidence in the record does not support a finding that Joseph has any APD that is not secondary to his intellectual disability. Fourth, the Court finds by a preponderance of the evidence that FCSB and FCPS provided a free and appropriate public education ("FAPE") to Joseph that accommodated and remediated his auditory processing deficits during the 2007-08 school year. Accordingly, the Court grants FCSB's Motion for Judgment on the Record and denies the Tordas' Motion for Judgment on the Record.


## I.   FACTUAL BACKGROUND

Joseph Torda is a young man with Down syndrome, significant cognitive deficits, communication difficulties, and motor skills problems. Administrative Record [hereinafter "A.R."] 29; A.R. 32; A.R. 48. Joseph functions significantly below age level in all academic and adaptive behavior areas. A.R. 19 at 3, 5; A.R. 48 at 8. His IQ has been measured at 51, and his cognitive ability falls within the "extremely low" range, below the first percentile. A.R. 48 at 3. Joseph has significant difficulty analyzing and synthesizing abstract concepts and can only retain very limited sets of information in his short-term memory. *Id.* at 4. His performance on cognitive assessments has indicated a low level of visual-motor integration skills commensurate with his general level of cognitive ability. *Id.*

## A. The 2007-08 School Year

During the 2006-07 school year, Joseph was 17 and 18 years old and attended Oakton

High School of Fairfax County Public Schools ("FCPS"). A.R. 14 at 16. Joseph's mother, Susan

Capuano Torda, and FCPS agreed on an Individual Education Program ("IEP") for Joseph for

that school year on May 4, 2005. A.R. 13. Following the completion of numerous educational,

psychological, and other assessments for Joseph, Ms. Torda and an Eligibility Committee made

up of FCPS staff convened on January 11, 2006, to determine Joseph's area(s) of disability and

eligibility for special education services. A.R. 2; A.R. 314 at 106-07; A.R. 316 at 1058-60. The

Committee concluded that Joseph was properly classified as eligible for special education

services on the basis of "mental retardation," a disability category recognized under the

Individuals with Disabilities Education Act ("IDEA") and now designated "intellectual

disability." A.R. 2.

The Committee also considered as alternative bases for eligibility the categories of

"autism" and "visual impairment," but ultimately determined that Joseph did not meet the criteria

for those disabilities. A.R. 2 at 2, 4-5; A.R. 314 at 106-07; A.R. 316 at 1058-60. With respect to

autism, the Committee concluded that, despite Joseph's deficits in verbal communication, his

oral language scores were "commensurate with measures of his cognitive ability." A.R. 2 at 4.

Ms. Torda disagreed with the Eligibility Committee's decisions at the time and suggested that

auditory deficits could not be "ruled out as the primary cause for deficits in cognitive ability and

adaptive behavior." *Id.* at 1, 3. Ms. Torda did not appeal the decision of the Eligibility

Committee or request an administrative hearing to challenge the decision. A.R. 316 at 1092-95.

Ms. Torda and FCPS staff met several times between August 2006 and November 2007

to prepare an IEP for Joseph. A.R. 14; A.R. 15; A.R. 16. The IEP Team identified several areas

of need for Joseph, including the basic reading skills, oral communication skills, written language skills, math skills, participation in physical education, and career skills, and set short-term objectives and annual goals for Joseph that reflected his educational needs. A.R. 14; A.R. 15; A.R. 16. To meet these educational goals, FCPS staff on the Team proposed: 24 hours per week of support services for Joseph's intellectual disability in a special education setting; 1.5 hours per week of speech and language services; four hours per week of adaptive physical education; two hours per month of occupational therapy; Work Awareness Transition ("WAT") classes; participation in Community Based Instruction ("CBI"); and other measures designed to address Joseph's needs. A.R. 4; A.R. 16. In WAT, special education students "work on job skills[,] working in a group[,] independent living[, and] social skills." A.R. 314 at 111; *see also* A.R. 315 at 757. In CBI, students work toward goals involving "money skills, . . . speech skills, [and] transportation skills." A.R. 314 at 110.

Ms. Torda consistently disagreed with FCPS's proposed IEP. She rejected WAT and CBI because CBI raised safety concerns for her and she did not believe WAT would teach independent living or life skills. A.R. 316 at 1097. Ms. Torda requested 1.5 to two hours per day of Lindamood-Bell ("LMB") service, a private, non-school educational program that involves individualized instruction on reading. A.R. 4; A.R. 16; A.R. 19. FCPS rejected this request because it detected progress in Joseph's vocabulary and reading skills through the program that was in place at the time. A.R. 4. Without Ms. Torda's consent for a new IEP, FCPS implemented the last agreed-upon IEP, which had been endorsed on May 4, 2005. After Ms. Torda raised concerns about Joseph's eligibility determination as intellectually disabled, FCPS advised Ms. Torda that Joseph would need to be reevaluated before any changes could be made to his classification. A.R. 8. On December 12, 2007, the school system offered to conduct new

4

psychological, educational, and opthamalogical testing, but Ms. Torda refused consent for the new evaluations. A.R. 7.

On February 28, 2008, Ms. Torda consented to an IEP "to update goals" from the May 2005 IEP but did not agree that this IEP would provide the free and appropriate public education ("FAPE") required under the IDEA. A.R. 21. The differences between the IEP previously proposed by FCPS staff and the IEP signed on February 28, 2008, were that the former included WAT and CBI and, in the latter, eight of the 24 hours dedicated to providing services for Joseph's intellectual disability in the proposed IEP were used to provide services for autism, a major concern for Ms. Torda at the time. A.R. 4; A.R. 16; A.R. 21.

Joseph demonstrated progress toward many of the educational goals identified in his IEP during the 2007-08 school year. Joseph mastered of Dolch word lists, and his performance on Brigance Comprehensive Inventory of Basic Skills and Lexia Comprehensive Reading Test improved over the course of the year. A.R. 55; A.R. 64; A.R. 65. Joseph's grades also improved, and FCPS reported an increase in the level of Joseph's independence. A.R. 52; A.R. 53; A.R. 314 at 133. Joseph's basic reading skills improved, including his ability to use phonetic strategies to decode words. A.R. 53. By the end of January 2008, Joseph met the criteria for or made sufficient progress toward achieving several goals identified in his IEP and made at least some progress toward achieving others. A.R. 64.

## B. Evaluations of Language and Auditory Processing

A number of evaluations of Joseph's language and auditory processing abilities have been completed and reported since 2005. The most relevant evaluations for the purposes of the present litigation are summarized below.

In 2005, Joseph was referred by FCPS to audiologist Dr. Jay Lucker for an individual educational evaluation ("IEE") on Joseph's comprehensive language processing abilities. A.R. 168 at 1. On June 1, 2005, Dr. Lucker completed his Language Processing Evaluation of Joseph ("2005 Lucker Report") and concluded that Joseph had "a specific deficit in auditory comprehension that is not explained solely because of his cognitive limitations." A.R. 168 at 3. Dr. Lucker's conclusion was based on a comparison between Joseph's performance on the Comprehensive Assessment of Spoken Language ("CASL") and the performance of children of age 4.5 years on the battery of tests. This comparison method was premised on the estimation of Joseph's mental or cognitive age at 4.5 years at that time. *Id.* at 2-3. Dr. Lucker noted "a possible auditory processing deficit" based on Joseph's test results but emphasized that he (Dr. Lucker) had "insufficient information to determine what specific auditory processing deficient Joey ha[d.]" *Id.* at 5. In order to determine the appropriate accommodations and treatment for Joseph's auditory processing problems, Dr. Lucker recommended a comprehensive auditory processing assessment. *Id.* at 5-6.

FCPS referred Joseph for a neuropsychological IEE that was completed on April 22, 2010. A.R. 311. In her Report of Neuropsychological Evaluation ("Gordon Report"), clinical psychologist Dr. Amy Gordon concluded that Joseph was functioning with "Moderate Intellectual Disability" and "a global pattern of dysfunction in all areas of neuropsychological performance." *Id.* at 13. Dr. Gordon estimated Joseph's mental age to be at the five- or six-year-old level but determined that he was "functioning significantly below the six-year-old level in many cognitive and academic areas." *Id.* Particular deficits were found in the areas of reading comprehension, math reasoning skills, receptive language skills (including auditory processing),

visual-perceptual skills, visual-motor integration, and learning and memory for visual and verbal information. *Id.*

Joseph was referred for a speech and language IEE that was completed on April 30, 2010. A.R. 310. In his Speech and Language Evaluation ("LeMieux Report"), speech-language pathologist Michael LeMieux concluded that Joseph "demonstrated basic language skills commensurate with his [mental age of 4.5 to five years.]" *Id.* at 8. Joseph "demonstrated significantly lower scores in overall central auditory processing, paragraph comprehension, understanding and using grammatical rules, understanding and using concept . . . words, articulation deficits at the phrase-to-sentence level, as well as poor oral-sensory-motor skills and planning." *Id.*

Joseph was also referred for a comprehensive auditory processing assessment by Dr. Jay Lucker that was completed on May 15, 2010. A.R. 458. In his Auditory Information Processing Assessment ("2010 Lucker Report"), Dr. Lucker again used the method of comparing Joseph to children with a chronological age of six years based on Joseph's mental age. Dr. Lucker concluded that Joseph had specific auditory processing deficits that were "*not* due merely to cognitive limitation alone." *Id.* at 3-4. Specifically, Dr. Lucker found that Joseph had deficits at the levels of auditory overloading, auditory lexical integration, auditory temporal processing, and auditory memory. *Id.* at 8. In his Report, Dr. Lucker offered specific recommendations on how Joseph's deficits could be accommodated and remediated in an educational setting. *Id.* at 8-9.

On October 4, 2011, school psychologist Dr. David W. Thompson completed a Report of Psychological Evaluation of Joseph Torda ("Thompson Report") "to assist in determining his educational needs" and to respond to the 2010 Lucker Report. A.R. 462 at 1-2. Dr. Thompson noted that "there are no tests of auditory processing currently available that have been adequately

normed on individuals with various levels of intellectual disability[.]"*Id.* at 3, 5. However, Dr.

Thompson "decided that such testing could reasonably be conducted using two tests that are

frequently administered by psychologists which have been found to aid in identifying and

programming for auditory processing deficits." *Id.* at 5. Dr. Thompson administered the Auditory

Processing cluster of the Woodcock-Johnson III Normative Update Tests of Cognitive Abilities

on Joseph. *Id.* at 3. He found that Joseph's "performance . . . was significantly below the level

expected of a student his [chronological] age [but] consistent with his previous measures of his

general cognitive ability." *Id.* Dr. Thompson also administered the Test of Auditory Processing

Skills, Third Edition. *Id.* He found that Joseph's "auditory short-term memory and auditory

working memory [were] significantly low for his age and [were] commensurate with his general

intellectual ability." *Id.* at 4. Dr. Thompson concluded,

> the deficits Dr. Lucker identified in his testing are not an artifact of a specific
> Auditory Processing Disorder, but are related to Joey's very significant cognitive
> limitations. . . . In this examiner's opinion, there is no demonstrably significant
> discrepancy between Joey's low auditory processing skills and his low level of
> general intellectual ability.

*Id.* at 5.

On October 5, 2011, speech-language pathologist Elizabeth Johnson completed a Speech

and Language Evaluation Report ("Johnson Report") "to provide information directly related to

[Joseph's] processing of information" and to respond to the 2010 Lucker Report. A.R. 463 at 1.

Johnson completed "[f]ormal and informal measures [of] Joseph's speech and language skills[,]"

including a language sample and various tests of auditory comprehension and language

processing. *Id.* at 2. Johnson was able to attribute Joseph's performance on various tests she and

Dr. Lucker administered to Joseph's limited vocabulary, lack of understanding of the attributes

of words, and poor understanding and use of word structure rules. *Id.* at 5-10. Johnson found that

these problems were consistent with characteristics of children with Down syndrome, which

8

include delays in expressive syntax, errors of grammatical morpheme omission and use, and general difficulty with the structural aspects of language. *Id.* at 11-12. Johnson also explained that results of tests used by Dr. Lucker in his 2010 Report could not be reliably interpreted due to Joseph's inconsistent understanding of attributes for words and significant vocabulary deficits. *Id.* at 6-7.

Finally, Johnson cited several scholarly articles for the proposition that tests for APD are unsuitable for individuals with intellectual impairment, particularly those with a mental age below seven years, because "assessment instruments for APD are influenced by higher order cognitive skills[,] including language." *Id.* 13-16. "[I]dentifying an auditory processing disorder in a student with a cognitive impairment and attributing language problems to APD does not follow best practice in current research." *Id.* at 16. Johnson concluded that "Joseph continues to exhibit an oral language disorder characterized by significant deficits [in] understanding and using oral language, secondary to intellectual disability." *Id.* at 18.

## II.  PROCEDURAL HISTORY

In October 2009, Joseph's parents, Susan Capuano Torda and Thomas Torda, requested from the Virginia Department of Education an administrative hearing to challenge the educational program FCPS provided to Joseph during the 2007-08 school year. The Tordas withdrew the original complaint to permit mediation but then re-filed on March 19, 2010, with an agreement from the School Board to toll the statute of limitations. A.R. 318.

The administrative hearing on the Tordas' complaint was conducted in May 2010 before an independent hearing officer appointed by the Supreme Court of Virginia, Frank G. Aschmann. The hearing officer heard 31 witnesses and reviewed 310 documents, including the Gordon and

LeMieux Reports. The Tordas sought to introduce the 2010 Lucker Report, but the hearing

officer excluded it on procedural grounds. In a decision issued on June 11, 2010, the hearing

officer found that FCPS did not overlook any of Joseph's areas of disability, A.R. 456 at 15, and

that both the May 2005 "stay-put" IEP and the IEP with updated goals contained "goals and

objectives, classroom accommodations, [and] related services[,] including . . . occupational

therapy[,]" that were "appropriate . . . for Joey, at the time," *id.* at 3. However, the hearing

officer also concluded that FCPS failed to provide FAPE in regard to the provision of

occupational therapy services during the 2007-08 school year and that Joseph was entitled to

twelve hours of compensatory occupational therapy services. *Id.* at 15-16.

On February 24, 2012, the Tordas filed their Complaint with this Court seeking an Order

ruling that: (a) the opinion of the hearing officer was in error insofar as he ruled that the Fairfax

County School Board ("FCSB") had not overlooked any of Joseph's areas of disability; (b)

FCSB suspected that Joseph had APD and failed to conduct an appropriate evaluation to confirm

this; (c) FCSB's failure to conduct this evaluation was a violation of IDEA and denial of FAPE;

(d) FCSB must amend Joseph's education records to reflect the fact that he has APD and

multiple disabilities; and (e) the educational program provided for Joseph during the 2007-08

school year was inappropriate for its failure to address Joseph's APD. The Tordas also seek

compensatory education for Joseph and an award of attorneys' fees and costs. The Court

admitted as additional evidence the 2010 Lucker Report along with the Thompson Report, the

Johnson Report, and a number of declarations from FCPS staff responsive to the Lucker Report.

The Court also admitted a letter written by Dr. Lucker on November 17, 2011 ("2011 Lucker

Report"), and a declaration from Ms. Torda, both responding to the Thompson and Johnson

Reports and FCPS staff declarations. Finally, the Court admitted declarations from Thompson,

Johnson, and FCPS staff in response to the 2011 Lucker Report and declaration of Ms. Torda,

along with several scholarly articles cited in the Johnson Report. The parties filed cross-motions

for judgment on the administrative record on January 30, 2012, and the Court heard oral

argument on February 27, 2012.

## III.   STANDARD OF REVIEW

Any party involved in an administrative hearing under the Individuals with Disabilities

Education Act ("IDEA") challenging "the identification, evaluation, or educational placement of

the child" may seek relief from the decision by bringing a civil action in state court or a federal

district court. 20 U.S.C. § 1415(i) (2012). A district court reviewing a state administrative

decision in a case arising under the IDEA considers the administrative record, as well as any

additional evidence offered by a party, and "grant[s] such relief as the court determines is

appropriate" based "on the preponderance of the evidence." 20 U.S.C. § 1415(i)(2)(C); *see also*

*Cnty. Sch. Bd. of Henrico Cnty. v. Z.P.*, 399 F.3d 298, 304 (4th Cir. 2005) (civil actions under the

IDEA for review of administrative decisions as "procedurally unique"). However, "the provision

that a reviewing court base its decision on 'the preponderance of the evidence' is by no means an

invitation to the courts to substitute their own notions of sound educational policy for those of

the school authorities which they review." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 206 (1982),

*quoted in A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 325 (4th Cir. 2004).

Upon review of the decision of the administrative hearing officer in IDEA cases, the

district court is to consider the hearing officer's "regularly made" factual findings as *prima facie*

correct. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991), *quoted in A.B.*, 354

F.3d at 325. "[A] reviewing court should examine the way in which the state administrative

11

authorities have arrived at their administrative decision and the methods employed[,]" according weight only where "the fact-finding" norm has been followed. *Doyle*, 953 F.2d at 105. *See also Rowley*, 458 U.S. at 206 (requirement that reviewing court "receive" administrative record carries the "implied requirement that due weight shall be given to these proceedings"); *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254, 259 (4th Cir. 2008) (factual findings made in state administrative proceedings but "not 'regularly made' . . . are not entitled to deference"); *Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 1000 (4th Cir. 1997) ("federal courts must accord 'due weight' to state administrative proceedings"). "Factual findings are not regularly made if they are reached through a process that is 'far from the accepted norm of a fact-finding process.'" *Z.P.*, 399 F.3d at 305 (quoting *Doyle*, 953 F.2d at 104). The hearing officer's decision is not required to provide "any particular level of detail" in its assessment or analysis of the evidence. *J.P.*, 516 F.3d at 262. If the district court does not follow the factual findings of the hearing officer, it "is required to explain why it does not." *Doyle*, 953 F.2d at 105.


IV.   **ANALYSIS**

The Court grants FCSB's Motion for Judgment on the Record and denies the Tordas' Motion for Judgment on the Record for two reasons. First, FCSB is not liable for failing to evaluate Joseph for Auditory Processing Disorder ("APD") or overlooking his APD status. Any claim against FCSB for the school system's failure to evaluate Joseph's auditory processing abilities is either barred by the applicable statute of limitations or Ms. Torda's conduct in refusing consent to reevaluation. Additionally, the Court cannot find by a preponderance of the evidence that Joseph in fact has any APD that is not secondary to his intellectual disability.

Second, a preponderance of the evidence shows that FCPS properly accommodated and remediated any auditory processing deficits in Joseph's educational program during the 2007-08 school year.

## A. Evaluation of Joseph Torda for Auditory Processing Disorder

FCSB is not liable for any violation of the IDEA in failing to evaluate Joseph Torda for APD, and FCSB did not overlook any area of suspected disability in providing services to Joseph.

"[B]efore the initial provision of special education and related services to a child with a disability [under the IDEA,]" the child's eligibility for special education services and educational needs as a "child with a disability" must be determined by "a full and individual initial evaluation" by the state or local educational agency. 20 U.S.C. § 1414(a)(1)(A), (b)(4)(A). "Child with a disability" is a term of art only identifying children with a specific set of disabilities and impairments, including intellectual disabilities, hearing impairments, visual impairments, autism, and specific learning disabilities. *See* 20 U.S.C. § 1401(3)(A). A "specific learning disability" is "a disorder in [one] or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in the imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations." 20 U.S.C. § 1401(30)(A); *see also* 34 C.F.R. § 300.8(c)(10)(i) (2011). "[A] learning problem that is primarily the result of visual, hearing, or motor disabilities [or] of intellectual disabilities" is not considered a "specific learning disability." 20 U.S.C. § 1401(30)(C); *see also* 34 C.F.R. § 300.8(c)(10)(ii). A child must be reported under the category "multiple disabilities" if the child has "concomitant impairments . . . , the combination of which causes such severe educational

needs that they cannot be accommodated in special education programs solely for one of the impairments." 34 C.F.R. §§ 300.641(d)(2), 300.8(c)(7).

The local educational agency must "ensure that . . . the child is assessed in all areas of suspected disability[.]" 20 U.S.C. § 1414(b)(3)(B). The IDEA requires the local educational agency, in conducting the evaluation of the child, to "use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining (i) whether the child is a child with a disability; and (ii) the content of the child's individualized education program[.]" 20 U.S.C. § 1414(b)(2)(A). A reevaluation must be conducted "(i) if the local educational agency determines that the educational or related service needs . . . of the child warrant a reevaluation; or (ii) if the child's parents or teacher requests a reevaluation." 20 U.S.C. § 1414(a)(2)(A).

> [I]f a student's parents want him to receive special education under the IDEA, they must allow the school itself to reevaluate the student and they cannot force the school to rely solely on an independent evaluation. Practically speaking, a school board needs the cooperation of the parent(s) to properly evaluate a child and convene a case conference to thereby determine what level of services would address the child's disability.

*Patricia P. v. Bd. of Educ. of Oak Park*, 203 F.3d 462, 468 (7th Cir. 2000) (quoting *Andress v. Cleveland Indep. Sch. Dist.*, 64 F.3d 176, 178 (5th Cir. 1995)) (internal quotation marks omitted). A reevaluation must be conducted "at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary[,]" but "not more frequently than once a year, unless the parent and the local educational agency agree otherwise[.]" 20 U.S.C. § 1414(a)(2)(B).

Under the IDEA, a party may present a complaint to the state or local educational agency "with respect to any matter relating to the identification, evaluation, or educational placement of the child[.]" 20 U.S.C. § 1415(b)(6)(A). In Virginia, the Virginia Department of Education

14

receives and handles such complaints, and administers the system by which such complaints are heard and adjudicated. 8 Va. Admin. Code 20-81-20(11) (2010). A two-year statute of limitations applies to the submission of this complaint, requiring the violation alleged to have "occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint[.]" 20 U.S.C. § 1415(b)(6)(B).

The Court rejects the Tordas' claim that FCSB is liable under the IDEA for failing to evaluate Joseph for APD and overlooking this area of disability because: (1) any claim against FCSB for failing to evaluate Joseph for APD is either time-barred or barred by Ms. Torda's refusal to consent to reevaluation; and (2) the preponderance of the evidence in the record does not support a finding that Joseph has any APD that is not primarily the result of his intellectual disability.

### 1.   The Failure of FCPS to Evaluate Joseph Torda for Auditory Processing Deficits

In his 2005 Report, audiologist Dr. Jay Lucker found "a possible auditory processing deficit" in Joseph and recommended a comprehensive auditory processing assessment. The Tordas argue that this Report either raised FCPS's suspicion of auditory processing deficits as an area of disability for Joseph or should have raised this suspicion. In failing to conduct a comprehensive auditory processing assessment after receiving the 2005 Lucker Report, the plaintiffs argue, FCPS failed to assess Joseph "in all areas of suspected disability," 20 U.S.C. § 1414(b)(3)(B), and therefore violated the IDEA.

The Court holds that FCSB is not liable under the IDEA for failing to evaluate Joseph for auditory processing deficits because: (a) any failure to conduct an auditory processing evaluation

in 2006 is beyond the statute of limitations applicable to this case; and (b) Ms. Torda refused

consent to reevaluation of Joseph as recommended by the school system in December 2007.

### a.  The Failure to Evaluate Joseph in 2006

Any challenge the Tordas pose to FCPS's 2006 evaluation process or eligibility

determination is untimely because administrative complaints brought under IDEA are subject to

a two-year statute of limitations. *See* 20 U.S.C. § 1415(b)(6)(B). Joseph's eligibility for special

education services during the 2007-08 school year was determined by reevaluation conducted in

January 2006. A.R. 2. The Eligibility Committee ruled out visual and auditory deficits as the

primary cause of Joseph's deficits in cognitive ability and adaptive behavior, though Ms. Torda

disagreed with this determination. *Id.* Pursuant to an agreement between the parties, the Tordas'

administrative complaint is treated as having been filed on October 7, 2009. A.R. 318 at 2. Thus,

the Tordas may not challenge any conduct by FCSB or FCPS made prior to October 7, 2007,

near the beginning of the 2007-08 school year. Such conduct beyond the reach of the limitations

period would include any failure by FCPS to assess Joseph for APD in 2006 after any suspicion

of such a disability was raised in the 2005 Lucker Report. *See* 20 U.S.C. § 1414(b)(3)(B)

(requiring local educational agency to assess student "in all areas of suspected disability").

### b.  The Failure to Evaluate Joseph During the 2007-08 School Year

Any challenge the Tordas pose to FCPS's failure to reevaluate Joseph in 2007 is

foreclosed by Ms. Torda's refusal to consent to the school system's request for reevaluation at

that time. In response to concerns raised by Ms. Torda about Joseph's eligibility determination

and special education needs, FCPS advised Ms. Torda, in December 2007, that Joseph would

need to be reevaluated and offered to conduct new psychological, educational, and

opthamalogical testing. A.R. 7, 8. However, Ms. Torda refused consent for the new evaluations,

A.R. 7, and did not "allow [the] school district a reasonable opportunity to evaluate [Joseph and therefore] forfeit[ed her IDEA] claim[.]" *Patricia P.*, 203 F.3d at 469.[1] The Court agrees with the hearing officer's conclusion that the school system should not be held liable and required to provide compensatory education for conduct "directly attributable to the actions of the parent." A.R. 456 at 5 (citing *Hogan v. Fairfax Cnty. Sch. Bd.*, 645 F. Supp. 2d 554 (E.D.Va. 2009)).

The Court is not persuaded by the Tordas' argument that FCSB is liable for the school system's failure to conduct an auditory processing evaluation because FCPS never offered this specific type of evaluation and Ms. Torda never refused such an offer. Pls.' Mem. in Opp'n to Def.'s Mot. for J. on R. at 13. In support of their argument, the Tordas point out that the Notice and Consent for Evaluation form recommending reevaluation in December 2007 reflects the school system's offer of psychological, educational, and opthamalogical assessments but not audiological assessments. *See* A.R. 7. There is no evidence in the record that Ms. Torda ever requested evaluation for auditory processing deficits, even though, in light of the 2005 Lucker Report, she was as aware of the issue as the school system and has now made the issue the focal point of her case before this Court. *See* 20 U.S.C. § 1414(a)(2)(A) (local educational agency required to reevaluate student if parents request reevaluation). In fact, Ms. Torda testified at the due process hearing that she refused consent for reevaluation not because an assessment for APD was not offered, but because an assessment for autism was not offered. A.R. 316 at 1100-01 (Ms. Torda testifying "Mr. Thompson failed to administer any assessment . . . for autism, even though it was raised as an issue, and previously Joseph's been diagnosed for [pervasive developmental disorder]. So, on that basis, I declined further testing for Joseph, at that time.").

---

[1] The Court is not convinced that the *Patricia P.* case is distinguishable simply because the IDEA claimants in that case sought reimbursement for a private educational placement rather than the compensatory education sought in this case. *See Patricia P.*, 203 F.3d at 467-69. In both cases, the school system would be required to expend resources in order for the claimant to obtain the relief sought.

There is no evidence that, during the 2007-08 school year, Ms. Torda was interested in any specific auditory processing evaluation for Joseph, would not have refused an offer for such an evaluation, or refused consent for the evaluations offered based on the belief that auditory processing evaluation would not be included. The record does not reflect Ms. Torda's particular interest in an auditory processing evaluation until April 23, 2010, upon review of the Gordon Report, which was completed the day before. *See* A.R. 311; Dkt. No. 12-3 (email dated April 23, 2010, from Ms. Torda requesting IEE of "Joseph's auditory processing disability"). Ms. Torda's sudden interest in an auditory processing evaluation in 2010 could not have imposed a duty on FCPS to evaluate Joseph during the 2007-08 school year, especially given Ms. Torda's resistance to testing at the latter time.

More importantly, evidence in the record suggests that the psychological and educational testing proposed for Joseph in 2007 would have encompassed or led to testing for auditory processing issues. There is no evidence in the record suggesting that the testing recommended by FCPS in December 2007 would not have included an evaluation of auditory processing. The types of testing listed on the Notice and Consent for Evaluation form do not appear to represent mutually exclusive categories. *See* A.R. 7. For instance, "Hearing Screening" is listed along with "Audiological," which apparently includes a "complete assessment of hearing." *Id.* "Perceptual skills" is listed in the description of the "Psychological" evaluation proposed by the school system, suggesting that some testing of auditory processing could have been included as part of that evaluation. *Id.* The administrative hearing testimony of Maxine Cohen, the head of special education at Oakton High School, indicated that the evaluation proposed by FCPS in December 2007 was broad and calculated to determine Joseph's educational needs. A.R. 314 at 114.

Thus, the record suggests that Ms. Torda is now seeking relief from the failure of FCPS to do something Ms. Torda prevented FCPS from doing—conducting a reevaluation of Joseph to determine his educational needs during the 2007-08 school year. FCSB cannot be fairly held liable for such a failure, and Plaintiffs are not entitled to compensatory education on this basis. *See Patricia P.*, 203 F.3d at 468-69; *Andress*, 64 F.3d at 178. Accordingly, the Court denies the Tordas' request for an order declaring that FCSB violated the IDEA in failing to conduct an auditory processing evaluation of Joseph Torda.

### 2. Joseph Torda's Auditory Processing Disorder Diagnosis

In his written decision, the administrative hearing officer did not address the question of Joseph's alleged auditory processing deficits, which was presented in the Tordas' administrative complaint, in Ms. Torda's closing argument, and at other points in the administrative record. *See, e.g.*, A.R. 318, 453. The Court now takes up this issue, in light of the administrative record and the additional evidence. The Court holds that a preponderance of the evidence does not demonstrate that Joseph Torda has APD because: (a) in diagnosing Joseph with APD, Dr. Lucker employed dubious evaluative methods; and (b) the Court is persuaded by the Thompson Report and the Johnson Report that any auditory processing problems displayed by Joseph are primarily the result of his intellectual disability.

### a. The 2010 Lucker Report and the Johnson Report

First, the Court finds that the 2010 Lucker Report is entitled to little weight as evidence of Joseph's APD because the methods Dr. Lucker employed in assessing Joseph for APD were of highly questionable reliability. *See* A.R. 458. As an audiologist and an expert on the topic of APD, Dr. Lucker is qualified to assess auditory processing skills and to diagnose APD. However, Joseph's significant cognitive and intellectual impairment presents a well-recognized hurdle to

19

proper assessment and diagnosis of APD. FCSB has offered several exhibits that describe this problem, including the Johnson Report and a number of scholarly articles cited in this Report. *See* A.R. 463, 473-82.

One article cited in the Johnson Report is a report by the American Speech-Language-Hearing Association's ("ASHA")[2] Task Force on Central Auditory Processing Consensus Development. Based on this technical report, Johnson asserts that "results on behavioral tests of central auditory function in children whose mental age is below seven years" are "rendered questionable" by "task difficulty and performance variability." A.R. 463 at 13.

The ASHA report is also discussed in an article published in the February 2007 issue of *The Hearing Journal*.[3] A.R. 475; Kathleen Loftus West and Linda A. Guenette, *Determining Candidacy for (Central) Auditory Processing Evaluations*, 60 The Hearing J., Feb. 2007, at 41. This article echoes the ASHA report's recommendation that, in assessing auditory processing, audiologists "be sensitive to . . . cognitive factors[,] the influence of mental age[,]" and other factors. *Id.* The authors highlight "the need to understand and control for confounding factors to test performance to ensure that the behavior assessment of auditory processing skills accurately reflects central auditory function." *Id.* The article goes on to recommend that auditory processing testing be conducted only on children seven years of age or older because of the lack of normative data on auditory processing tasks for populations below age seven. *Id.* Next, the authors recommend that the testing candidate have a normal overall IQ because the child being evaluated "must be compared with age mates" and "[c]hildren with cognitive function below the

---

[2] ASHA is a credentialing professional organization for audiologists and speech language pathologists that Dr. Lucker cites numerous times in his reports. *See, e.g.*, A.R. 458 at 3 (2010 Lucker Report); A.R. 466 at 5, 6, 7, 9, 10 (2011 Lucker Report).

[3] This article was edited by Dr. Frank E. Musiek, who is cited as an authority on auditory processing disorder by Dr. Lucker. *See* A.R. 458 at 3 (2010 Lucker Report).

low-average range cannot be reliably compared with age mates." *Id.* Third, the authors

recommend that the child be "proficient in English" so that he or she may complete the tasks

required by the testing. *Id.*

The ASHA report is also discussed in an article published in the February 2008 issue of

the *American Journal of Speech-Language Pathology*, which states that "children whose

listening/auditory difficulties clearly stem from broader deficits in cognition, attention, memory,

or language comprehension would not be good [APD] test candidates." A.R. 477; David A.

DeBonis and Deborah Moncrieff, *Auditory Processing Disorders: An Update for Speech-*

*Language Pathologists*, 17 Am. J. Speech-Language Pathology, Feb. 2008, at 4, 11. The authors

note that the ASHA report "specifically mentions significant intellectual impairment as an

example of a comorbid diagnosis that would preclude APD testing[.]" *Id.* The article endorses

this view, stating that "students with significant intellectual impairment . . . are not good

candidates for APD testing." *Id.* Additionally, the authors cite the danger of not only

misdiagnosis but "misuse of an APD diagnosis as a substitute for a more accurate but less

acceptable label (*e.g.*, reduced cognitive ability)." *Id.*

The results of Johnson's evaluation of Joseph highlight the dangers of assessing him for

APD. *See generally* A.R. 463. Johnson is a speech language pathologist qualified to assess

speech and language skills and to provide educational recommendations based on her findings.

A.R. 469. Even if Johnson, as a speech language pathologist and not an audiologist, is not

qualified to diagnose auditory processing disorder, *see* A.R. 466 at 8, she is qualified to conduct

assessments that bear on the reliability of the APD testing conducted by Dr. Lucker and the

credibility of its results. For example, results of Johnson's speech and language evaluation

indicated Joseph's difficulty with basic language concepts and attributes. *Id.* at 6. On this basis,

Johnson concluded that the instructions given as part of APD testing administered by Dr. Lucker would be extremely difficult for Joseph to understand, rendering any results of the testing unreliable. *Id.* Other factors present in Joseph that Ms. Johnson suggested would confound Dr. Lucker's APD testing include Joseph's "significant deficits in vocabulary [and] lack of knowledge of specific [grammatical] morphemes embedded in sentences," like prepositions and noun-verb agreement. *Id.* at 7, 8.

Based on her evaluation of Joseph and review of the literature, Johnson concluded that "Joseph is not and never has been an appropriate candidate for central auditory processing disorder testing as was performed by Dr. Lucker." *Id.* at 14. Johnson stated further that "identifying an auditory processing disorder in a student with a cognitive impairment and attributing language problems to APD does not follow best practice in current research." *Id.* at 16. Thus, the Johnson Report and the literature on APD cited in that report and admitted as additional evidence in this case cast significant doubt on the reliability of Dr. Lucker's testing of Joseph Torda for APD.

Dr. Lucker proposed to avoid the significant obstacle presented in testing someone with such severe cognitive deficits by using the mental age of six years as a basis for comparing his test results to children aged six. A.R. 458 at 8. This method contradicts the recommendation offered in the literature that audiologists avoid assessing persons with a mental age below seven, particularly persons with severe cognitive impairment, for APD given the task difficulty and language demands involved with such testing. *See, e.g.*, A.R. 475; A.R. 477; A.R. 463 at 13-16. The method also contradicts the position that persons assessed for APD must be compared with *chronological* age mates and, therefore, only persons with normal overall IQ can be reliably assessed for the disorder. *See* A.R. 475; A.R. 462 at 2 (Dr. Thompson stating that Dr. Lucker's

results "are based on an unorthodox practice of making statistical comparisons based on calculations of 'mental age' norms, scoring each of the tests as if Joey were 6 years of age, rather than using the appropriate norms for his age"). In sum, the Court is persuaded by Johnson's conclusion that, given the risk of misdiagnosis, Dr. Lucker did not follow best practice in his assessment of Joseph for APD. At best, Dr. Lucker's method was controversial and his results inconclusive, falling short of meeting the Tordas' burden of proving Joseph's APD diagnosis in order to obtain the relief they seek.

**b. The Thompson Report**

Second, the Court finds the opinions of Johnson and Dr. Thompson credible and is persuaded that Joseph's apparent auditory processing deficits are commensurate with and secondary to his general intellectual deficits. *See* A.R. 462. Dr. Thompson is a school psychologist qualified to identify educationally relevant auditory processing problems. A.R. 468. At the outset of his Report, Dr. Thompson recognized the problems involved with assessing auditory processing issues in persons with severe cognitive impairment. He noted, for example, that "there are no tests of auditory processing currently available that are normed specifically on individuals with varying levels of general cognitive impairment." A.R. 462 at 3.

Dr. Thompson conducted a series of psychological tests on Joseph that bear on Joseph's auditory processing abilities[4] and concluded that Joseph's scores on these tests were significantly low for his chronological age but generally "commensurate with his general intellectual ability." A.R. 462 at 3-5. The auditory processing deficits found in Dr. Lucker's and Dr. Thompson's

---

[4] Both Dr. Lucker and Dr. Thompson recognize that the two experts were essentially testing different things. Dr. Lucker's evaluation is specifically directed toward the diagnosis of APD. Dr. Thompson tested for auditory processing abilities as measured by certain psychological tests, which is within his realm of qualification and expertise. A.R. 468. *See also* A.R. 483 at 863; Benjamin J. Lovett, *Auditory Processing Disorder: School Psychologist Beware?*, 48 Psychology in the Schools, no. 8, 2011, at 855, 863 ("[G]iven that many of the thorniest issues in the APD field involve school psychology-related topics . . . , school psychologists are uniquely valuable members of any team handling cases of suspected APD.").

evaluations, according to Dr. Thompson, are "very common among students with identified intellectual disabilities." A.R. 462 at 5. Dr. Thompson's results suggest that, with respect to Joseph's auditory processing difficulties, Joseph's primary impairment is his intellectual disability. Under IDEA, Joseph would not be considered as having a "specific learning disability" separate from his intellectual disability because this term excludes "learning problem[s] that [are] primarily the result of . . . intellectual disabilities." 20 U.S.C. § 1401(30)(C); *see also* 34 C.F.R. § 300.8(c)(10)(ii). Without a valid "specific learning disability" designation in combination with his "intellectual disability" designation, Joseph would not be legitimately designated as having "multiple disabilities." *See* 34 C.F.R. §§ 300.641(d)(2), 300.8(c)(7).

Thus, the preponderance of the evidence in the record does not support a finding that Joseph has APD or any auditory processing deficits that are not commensurate with or primarily the result of his general cognitive impairment. Accordingly, the Court denies the Tordas' request for an order declaring that Joseph has APD and directing amendment of Joseph's educational records to reflect this diagnosis.

### B.  Educational Program for Joseph Torda During the 2007-08 School Year

The Court finds, by a preponderance of the evidence, that FCSB and FCPS provided a free and appropriate public education ("FAPE") to Joseph that accommodated and remediated his auditory processing problems during the 2007-08 school year.

Among the purposes of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living[.]" 20 U.S.C. § 1400(d)(1)(A). "Under the

IDEA, a FAPE must provide [disabled] children with meaningful access to the educational

process. That is, a FAPE must be reasonably calculated to confer some educational benefit on a

disabled child." *M.M. ex rel. D.M. v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 526 (4th Cir.

2002) (citing *Rowley*, 458 U.S. at 192) (citation omitted).

The "individualized education program" ("IEP") is

a written statement . . . of the child's present levels of academic achievement and
functional performance[,] measurable annual . . . academic and functional goals[]
designed to meet the child's . . . educational needs that result from the child's
disability[,] how the child's progress . . . will be measured[,] the . . . services . . .
to be provided to the child[,] and the anticipated frequency, location, and duration
of those services.

20 U.S.C. § 1414(d)(1)(A)(i). The IEP is developed and periodically reviewed and revised by the

"IEP Team," which is comprised of the parents of the child, regular education teachers, special

education teachers, and representatives of the local educational agency. 20 U.S.C. §

1414(d)(1)(B). "As part of an initial evaluation [or] reevaluation . . . , the IEP Team and other

qualified professionals, as appropriate, [must] review existing evaluation data on the child,

including evaluations and information provided by the parents of the child [and] observations by

teachers and related services providers[.]" 20 U.S.C. § 1414(c)(1)(A). "[O]n the basis of that

review, and input from the child's parents, [the IEP Team must] identify what additional data, if

any, are needed to determine" the child's educational needs and eligibility for special education

services. 20 U.S.C. § 1414(c)(1)(B).

On review of an IEP challenged in a civil action brought under IDEA, "courts . . . ask

whether, at the time [the] IEP was created, it was 'reasonably calculated to enable to the child to

receive educational benefits.'" *Schaffer ex rel. Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir.

2009) (quoting *Rowley*, 458 U.S. at 207). "Local educators deserve latitude in determining the

individualized education program most appropriate for a disabled child." *Hartmann*, 118 F.3d at

1001; *see also M.M.*, 303 F.3d at 532 ("We have always been, and we should continue to be, reluctant to second-guess professional educators."). "IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent." *A.B.*, 354 F.3d at 328. However, "the fact-finder is not required to conclude that an IEP is appropriate simply because a teacher or other professional testifies that the IEP is appropriate." *Z.P.*, 399 F.3d at 307. Both the administrative hearing officer and the district court are "obligat[ed] to determine as a factual matter whether a given IEP is appropriate." *Id.*

"[E]vidence of educational progress under [the challenged] IEP is useful in deciding whether the IEP was appropriate." *Schaffer*, 554 F.3d at 478; *see also M.M.*, 303 F.3d at 532 (disabled student's "actual educational progress during [the school year in which the challenged IEP was effective is] an important measure of an IEP's success") (citing *Rowley*, 458 U.S. at 207 n.28). In considering such evidence, the Court should require more than "trivial academic advancement," but "the IDEA does not require a perfect education," *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 328 (4th Cir. 2009) (citations omitted), or "the best possible education," *M.M.*, 303 F.3d at 526. In suitable cases, the reviewing court may award "discretionary, prospective, injunctive relief" in the form of compensatory education to remedy "an educational deficit created by an educational agency's failure over a given period of time to provide a FAPE to a student." *G. ex rel. R.G. v. Fort Bragg Dependent Schs.*, 343 F.3d 295, 309 (4th Cir. 2003).

Based on the regularly made factual findings of the administrative hearing officer, the evidence in the administrative record, and the additional evidence admitted by this Court, the Court finds that Joseph's educational program during the 2007-08 school year was "reasonably calculated to confer some educational benefit" on Joseph. *M.M.*, 303 F.3d at 526 (citing *Rowley*,

458 U.S. at 192). The Eligibility Committee determined in January 2006 that Joseph met the criteria for the "mental retardation" category of disability and was therefore eligible for special education services. A.R. 2. The Committee noted that Joseph "required a modified curriculum to address his needs in reading, math, oral and written language instruction. Material needs to be presented in a concrete manner and practiced repeatedly." *Id.*

The IEP Team, which included Ms. Torda, met several times to determine Joseph's IEP for the 2007-08 school year. A.R. 14; A.R. 15; A.R. 16. On August 31, 2006, the IEP Team identified several areas of need for Joseph, including the basic reading skills, oral communication skills, written language skills, math skills, participation in physical education, and career skills. A.R. 14. With respect to reading and language skills, the Team determined that Joseph needed to improve in encoding and decoding unfamiliar words, self-correcting errored phoneme production, and producing complete and grammatically correct written sentences. *Id.* With respect to math skills, Joseph needed to improve in using manipulatives when counting, identifying the number of objects, and telling time to the quarter hour. *Id.* The Team also determined that Joseph needed to improve in choosing appropriate behaviors independently and maintaining conversational topic. *Id.* On April 10, 2007, the Team noted that Joseph's sentence structure had improved but that he still wrote in fragments and run-on sentences. A.R. 15. The Team also determined that Joseph was making progress in working independently but had difficulty following longer multistep tasks and communicating effectively in situations where he may need clarification in order to complete tasks. *Id.* At each IEP Team meeting, short-term objectives and annual goals were set for Joseph that reflected the educational needs identified by the Team. *Id.*; A.R. 14; A.R. 16.

The administrative record includes substantial evidence of Joseph's non-trivial progress during the 2007-08 school year in several of the areas of need identified by the IEP Team. Joseph's mastery of Dolch 2nd and 3rd grade word lists and his performance on Brigance Comprehensive Inventory of Basic Skills improved over the course of the year. A.R. 55. Joseph's grades improved over the course of the year. A.R. 52. In October 2007, FCPS reported an increase in the level of Joseph's independence, noting that Joseph was "able to find . . . and open [his locker] with a visual prompt, transition between classrooms, find his bus in the afternoon[, and] complete many familiar tasks in the classroom by himself. A.R. 53; *see also* A.R. 314 at 133. Joseph's basic reading skills improved. A.R. 53. Specifically, he was "able to use phonetic strategies to decode words[, though he had] difficulty applying those phonetic strategies when working on a reading activity." *Id.*

By the end of January 2008, Joseph met the criteria for or made sufficient progress toward achieving several goals identified in his IEP, including comprehension of sentences on a first grade level, adding and subtracting numbers with manipulatives or a calculator, following simple written and visual directions, demonstrating appropriate socialization skills in a small group setting, and producing certain target speech sounds in phrases and short sentences. A.R. 64. Joseph demonstrated some progress toward meeting other goals, such as using strategies when decoding and encoding words, locating and demonstrating comprehension of school signs, orally stating and keyboarding simple sentences, and filling out basic forms on the computer. *Id.* Joseph's performance on the Lexia Comprehensive Reading Test also improved over the course of 2008. A.R. 65. Joseph did not make progress toward all of the goals identified in his IEP. *See* A.R. 64 (noting no progress toward legible writing of personal data or tying shoes). However, the standard set by the IDEA does not require "the best possible education" but only an

educational program that is "reasonably calculated to confer some educational benefit" on the student with special educational needs. *M.M.*, 303 F.3d at 526 (citing *Rowley*, 458 U.S. at 192). The notes of the IEP Team and evidence of Joseph's educational progress demonstrate that Joseph's educational program during the 2007-08 school year was reasonably calculated to confer, and did confer, some educational benefit on Joseph.

The Tordas challenge the educational program provided by FCPS for Joseph during the 2007-08 school year for failing to appropriately address Joseph's auditory processing deficits and "multiple disabilities." Pls.' Mot. for J. on R. at 2. The Court notes again that APD is not an area of disability that would have made Joseph eligible for special educational services under the IDEA or Virginia regulations. *See* 20 U.S.C. § 1401(30)(C) ("learning problem that is primarily the result of . . . intellectual disabilities" is not considered a "specific learning disability"); 34 C.F.R. § 300.8(c)(10)(ii). The Tordas argue, however, that Joseph's auditory processing deficits created special educational needs that were not adequately addressed in his educational program at Oakton High School during the 2007-08 school year. The 2010 Lucker Report is the principal evidence of ways in which FCPS would have properly addressed Joseph's auditory processing problems. A.R. 458.

The Court holds, first, that the 2010 Lucker Report is entitled to little weight as evidence of Defendants' failure to provide a FAPE to Joseph during the 2007-08 school year because this Report was made after the challenged IEP was created and after the 2007-08 school year in which it was implemented. Any information or recommendations contained in the Report that would have been useful in the development of the 2007-08 IEP was not available at the time, and, therefore, it would be unreasonable to hold the school system liable for failing to consider it. *See Schaffer*, 554 F.3d at 477 ("Judicial review would simply not be fair to school districts,

whose decisions would be judged in hindsight based on later assessments of a student's needs at a later point in time.") (quotation omitted). As the U.S. Court of Appeals for the Fourth Circuit recognized in *Schaffer v. Weast*, 554 F.3d 470, 477 (4th Cir. 2009), "[j]udicial review of IEPs under the IDEA is meant to be largely prospective and to focus on a child's needs looking forward; . . . [b]ut this prospective review would be undercut if significant weight were always given to evidence that arose only after an IEP were created." The relevant inquiry is "whether, *at the time [the 2007-08] IEP was created*, it was 'reasonably calculated to enable the child to receive educational benefits[,]'" *Id.* (quoting *Rowley*, 458 U.S. at 207) (emphasis added), and the Court holds that it was.

Second, even if providing a FAPE to Joseph during the 2007-08 school year required FCPS to follow Dr. Lucker's 2010 recommendations, the Court finds that measures taken by FCPS staff as part of Joseph's educational program satisfied these recommendations. In his 2010 Report, Dr. Lucker recommended three accommodations and remediation in the form of direct speech-language services. *Id.* at 8-9. Accommodations recommended by Dr. Lucker include: (1) presenting verbal information to Joseph slowly and in "usable chunks" and then testing to ensure that Joseph recognizes the information; (2) simplifying messages presented to Joseph; and (3) using concrete visual cues. *Id.* Dr. Lucker also recommended speech-language services directed toward teaching Joseph "how to listen only for key words and then put them together to comprehend the whole" in order to improve Joseph's auditory integrative processing. *Id.* at 9.

Declarations offered by FCPS staff show that the educational program for Joseph during the 2007-08 school year included measures aligned with Dr. Lucker's recommendations. Maxine Cohen described in detail how strategies recommended by Dr. Lucker were implemented in Joseph's educational program. A.R. 459; A.R. 471. The level of detail provided in Cohen's

declarations goes beyond "merely parroting back" Dr. Lucker's recommendations, as Dr. Lucker

responds in his 2011 Report. A.R. 466 at 2. Cohen describes how "all instructions [to Joseph]

were broken down, simplified, clarified, visually reinforced, and demonstrated by a teacher or an

aid to insure [*sic*] Joseph's understanding of the activities." A.R. 459 at ¶ 4. Cohen observed

simplified language being used for Joseph "on a regular basis," with directions conveyed to

Joseph "concisely, slowly, and often [as] shorter verbal messages." *Id.* at ¶ 5; *see also* A.R. 471

at ¶ 4. Cohen describes how "concrete visual material was paired with oral instruction" for

Joseph, "integrated into his daily lessons" and "across subject areas. . . during the 2007-08

school year." A.R. 459 at ¶ 6; *see also* A.R. 471 at ¶ 4. Cohen provides specific examples of such

visual aids, including "a picture schedule" that visually represented Joseph's daily classes and

activities. A.R. 459 at ¶ 6. Cohen also describes in detail teachers' use of "visual cueing for

verbal instructions" focused on decoding and spelling unfamiliar words, *id.*, an educational

objective consistently identified by the IEP Team in 2007, A.R. 16. Cohen's declarations show

that the techniques employed for Joseph both accommodated his disabilities and offered

remediation, as, for example, "the difficulty level increased [o]nce Joseph was able to

demonstrate understanding of certain commands[.]" A.R. 459 at ¶ 5.

Dawn M. Campanell, special education teacher to Joseph during the 2007-08 school year,

describes how she presented verbal information slowly and in chunks to Joseph and then tested

him to see if her instruction was understood. A.R. 460 at ¶ 4. Ms. Campanell also describes how,

after Joseph's participation in a small group lesson on verbal concepts, "[h]e would . . . receive

individualized attention . . . to see if he fully understood the concept being taught." A.R. 472 at ¶

3. As an example of visual cues used by Ms. Campanell and other teachers as "an everyday part"

of Joseph's educational program, Ms. Campanell describes visual aids used to help Joseph

answer "wh" questions, 460 at ¶¶ 4, 6, an educational objective consistently identified by the IEP

Team in 2007, A.R. 16. "[I]n class every day," Ms. Campanell simplified messages presented to

Joseph and focused on the key words of her instructions to Joseph. A.R. 460 at ¶¶ 5, 8. Ms.

Campanell also provided direct services to Joseph everyday as Joseph required one-on-one

instruction "for almost all tasks." *Id.* at ¶ 7. The methods employed by Ms. Campanell were

focused on both accommodating and remediating Joseph's unique disabilities and educational

needs. A.R. 472 at ¶ 3.

Judith C. Turcott, a speech pathologist who worked with Joseph during the 2007-08

school year, also describes how techniques she employed both accommodated and remediated

Joseph's speech- and language-related problems. A.R. 470; *see also* A.R. 461. Turcott described

how repetition was used to give Joseph "time to process and understand information" and then

"put together messages and comprehend for meaning." A.R. 470 at ¶ 4. According to Turcott,

"[t]he nature of classroom teaching was to break down information for Joseph, present it in

smaller, logical pieces to allow him to manage these smaller pieces." A.R. 461 at ¶ 3. Concepts

and information were reviewed and, as needed, retaught. *Id.* Turcott provides specific examples

of how information was simplified, repeated, and broken down for Joseph during reading

instruction. *Id.* Turcott used concrete visual cues like drawings and cue cards that included words

and pictures that helped Joseph "to relate what he heard to what he saw." A.R. 470 at ¶ 5; A.R.

461 at ¶¶ 4, 5.

The Tordas' argument that Joseph's educational program was defective due to FCPS's

failure to implement "intensive" one-on-one services "on a daily basis" is without merit. Pls.'

Mem. Supp. Mot. for J. on R. at 14-16. First, FCPS recognized Joseph's need for individualized

instruction and, in fact, provided a significant amount of one-one-one instruction and services to

Joseph during the 2007-08 school year. Each of the IEPs proposed and agreed-upon for Joseph between 2006 and 2008 provided for individualized instruction. *See* A.R. 14-21. Campanell declares that she and her instructional assistant provided significant direct services to Joseph every day, describing in detail Joseph's need for individual attention and how this was provided. A.R. 460 ¶ 7; *see also* A.R. 315 at 650-52 (Campanell testimony at administrative hearing).

Second, there is no evidence in the record to suggest that, at the time the 2007-08 IEP was created and implemented, there was any indication to FCPS that Joseph had an educational need for one-on-one services exceeding the individualized instruction he was receiving. There was no indication during the 2007-08 school year that Joseph had an educational need for one-on-one services requiring a specific allotment of time and prescribed frequency. One of the responses Ms. Torda made to the 2007-08 IEP was a demand for one-on-one instruction for 1.5 hours per day. A.R. 21 at 17. However, Ms. Torda's demands for Joseph's educational program do not amount to demonstrated educational needs in Joseph and do not create automatic duties on FCPS to provide services in any particular manner. *See Hartmann*, 118 F.3d at 1001 ("Local educators deserve latitude in determining the individualized education program most appropriate for a disabled child.").

The Tordas' cite the district court and circuit court decisions in *M.S. v. Fairfax County School Board* to support their argument that the failure to prescribe specific time and frequency for one-on-one instruction constitutes a denial of FAPE. *See* 553 F.3d 315 (4th Cir. 2009); 2007 WL 1378545 (E.D. Va. May 8, 2007). However, neither decision stands for the proposition that a denial of FAPE is found where an "IEP contain[s] no assurances that a disabled child would receive the one-on-one instruction that his parents requested." Pls.' Mem. Supp. Mot. for J. on R. at 28 (quoting *M.S.*, 553 F.3d at 320). As the Fourth Circuit emphasized, the hearing officer's

decision was driven in part by his finding that M.S. needed "an intensive one-on-one academic program." *M.S.*, 553 F.3d at 323. This Court, in the decision by Judge Cacheris, agreed with the hearing officer "that M.S. needed significant one-on-one instruction that Fairfax County failed to provide for 2002-2005." *Id.* at 326. Therefore, the Court agreed with the hearing officer's conclusion "that the IEPs were invalid because they focused too much on group interaction and too little on one-on-one instruction." *Id.* at 323.

In this case, the hearing officer made no finding that Joseph required "intensive" one-on-one instruction or one-on-one instruction of any particular amount or frequency. Not even the 2010 Lucker Report, upon which the Tordas rely for the proposition that Joseph's IEP should have provided such specifics, contains a recommendation for any specific amount or frequency of one-on-one instruction. *See* A.R. 458. Based on the record, the Court declines to second-guess the judgment of the professional educators who worked with Joseph on a daily and weekly basis. *M.M.*, 303 F.3d at 532. According their judgment due deference, *A.B.*, 354 F.3d at 328, the Court finds that the individualized instruction provided for in Joseph's IEP as written and implemented was sufficient to afford him with FAPE. In this case, the IEP Team's failure to prescribe a specific amount or frequency of individualized instruction did not constitute a denial of FAPE.

## V.   CONCLUSION

The Court denies the Tordas' Motion for Judgment on the Record. The Tordas' claim against FCSB for failing to evaluate Joseph for APD is either barred by the IDEA's two-year statute of limitations or Ms. Torda's conduct in refusing to consent to reevaluation in 2007. The preponderance of the evidence in the record does not support a finding that Joseph has multiple disabilities or any APD that is not primarily the result of his intellectual disability. Thus, any

34

auditory processing problems that Joseph has cannot justify an order that FCPS amend Joseph's educational records to reflect APD. The Court holds that the administrative hearing officer did not err in finding that FCPS did not overlook any areas of disability for Joseph. The Court holds that FCSB and FCPS provided a free and appropriate public education ("FAPE") to Joseph during the 2007-08 school year. Therefore, Joseph is not entitled to compensatory education. Accordingly, the Court grants FCSB's Motion for Judgment on the Record and denies the Tordas' Motion for Judgment on the Record.

The Clerk is directed to forward a copy of this Memorandum Opinion to counsel of record.

ENTERED this 21st day of June, 2012.

Alexandria, Virginia

6 / 21 / 12

_____/s/_____
Gerald Bruce Lee
United States District Judge

35